Filed 4/23/14  P. v. Knox CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B237213 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA061857) |
| v. | |
| TYQUAN CARL KNOX, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

Marilyn G. Burkhardt, under appointment by the Court of Appeal; and Ronald White for Defendant and Appellant.  [*Retained*.]

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Kenneth C. Byrne and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Tyquan Carl Knox guilty of robbery and of special circumstance first degree murder by lying in wait. He contends on appeal that there is insufficient evidence to support the murder and robbery convictions and the special circumstance finding. He also raises issues concerning the admissibility of evidence and ineffective assistance of counsel. We disagree with all contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Factual background.

A.     *September 2, 2006: The robbery of Khristina Henry and Donovan Dias.*

On the evening of September 2, 2006, Khristina Henry, Donovan Dias, Ebonie White, and Amber Mize went to the El Dorado Bowling Alley. When the friends left the bowling alley after midnight, there were 20 to 25 people, perhaps fewer, outside. Henry exchanged greetings with Ryan Betton, a friend from middle school.

When Henry got to the car, defendant approached Dias and said, " 'What you got? Give me what you got.' " When Dias replied he didn't have anything, defendant cocked a gun and again told Dias to give him what he had or he would kill or shoot him.

According to Henry, another man said they wanted " 'everything,' " including " 'sidekicks,' " slang for cell phones.[1] Henry gave the man her cell phone, and defendant took Dias's wallet and diamond cut Rolex chain. Defendant and the man then walked to Betton. In the car, White said, " 'That was Tyquan.' " She recognized defendant because they went to school together at Crenshaw High, and defendant played football with White's boyfriend.

That morning, September 3, 2006, Henry's mother, Pamela Lark, took her and Dias to the police station, and Henry named defendant as the robber. A couple of days

---

[1]     White never saw a second man. Dias testified that two men were with defendant.

later, Henry identified defendant from a photographic six-pack.[2]  White, Mize, and Dias also identified defendant from photographic six-packs.

A couple of weeks after Henry identified defendant, defendant's mother called Henry's cell phone, although Henry did not know how she got the number.  Henry turned on the speaker phone so that Lark could hear the conversation.  Defendant's mother said she wasn't trying to harass Henry; she was trying to figure out why the police were looking for her son and how much it would cost to make it go away.  Lark asked whether defendant's mother would ask such a question if defendant had killed Henry.

Frightened, Henry called Detective Thomas Vettraino, who was investigating the robberies, and told him she felt threatened.  Nonetheless, defendant's mother, a couple of weeks later, called Henry a second time.  A couple of hours later, defendant's mother called again and put defendant on the phone.  Defendant told Lark he didn't do it, to which Lark replied, " 'Sweetie, if you didn't do it, then you don't have anything to worry about because Khristina wouldn't lie on you.' "

Henry told the detective about this call and asked that her family be relocated.  Detective Vettraino said that if they found a place to live, relocation funds could be provided to them.  Although Henry and her mother searched for another apartment, they couldn't find one they could afford.

One month after Dias and Henry were robbed, defendant pawned a gold Rolex chain three times.  The first time was on October 9, 2006, but he picked it up the same day.  On November 14, 2006, defendant pawned a chain a second time for $500.  On December 27, 2006, defendant paid $540 to get the chain back.  Defendant pawned a chain again on January 3, 2007 for the same amount.  His mother redeemed it on March 10, 2007, but the pawnshop owner refused to give her the chain because it had a police hold on it.  The police failed to get a photograph of the chain defendant pawned and to show it to Dias to confirm it was the chain stolen from him.  The police hold was

---

[2]     She wrote, " 'No. 5 definitely has a familiar face out of all six pictures, and he looks like the guy with the gun.' "

3

inadvertently released, and the pawnshop owner, Steve Jacobson, testified that the chain was probably melted down.

On October 12, 2006, a criminal complaint was filed charging defendant with two counts of robbery. That same day, Betton, the former friend Henry saw just before being robbed, instant messaged her, asking what was happening with "the police thing." He wrote that defendant wasn't the one who robbed Henry; it was Shaddie Blue and Tiny Tony of the "40's" gang who robbed Henry and Dias. After exchanging a long series of instant messages with Betton, Henry was afraid. She told Detective Vettraino about the messages.

Henry received a subpoena to appear at a preliminary hearing concerning the robberies. Although Henry was afraid to go, her mother insisted. Lark drove Henry and Dias to the preliminary hearing in December 2006 in Lark's black Mustang. While at the courthouse, Henry saw defendant and Keeiarra Dashiell, defendant's girlfriend. The hearing, however, was continued to January 8, 2007.

A couple of weeks after the cancelled December hearing, Dashiell went to the coffee shop where Henry worked. Dashiell ordered a drink and stared at Henry "like I was the only person in there." Feeling threatened, Henry told Detective Vettraino about this latest incident and said she wouldn't go to court. He told her she could go to jail if she didn't appear in court. Lark also told her daughter she had to go to court.

Dias also received a phone call that frightened him. On January 2, 2007, Sequoia, a high school friend, told him he had better watch his back because the court date was coming up.

Just two days, later, Henry's mother, Lark, was murdered.

B.      *January 4, 2007: the murder of Lark.*

Lark and Henry lived in an apartment at 2239 Marvin Avenue. The apartment building shared a driveway with 2233 Marvin Avenue, and the only way to access the rear parking lot by car was by that shared driveway. Lark parked her black Mustang in the rear parking lot, space No. 4. A wrought iron fence that was sometimes locked, surrounded the building.

4

Because of the perceived threats, Lark decided that Henry should not be alone. Therefore, on January 4, 2007, Henry's brother drove Henry to college at 7:00 a.m. When Henry left that morning, she did not see anyone outside her apartment.

Around 9:00 in the morning, Lane's uncle, Craig, left the apartment. About a minute after Craig left, Lark, her 17-year-old niece Dechanne Lane, and 2-year-old nephew Gregory Lane also left the apartment. They went to Lark's car, which was parked in the apartment building's back parking lot. Lane did not see anybody in the parking lot. After Lark threw some trash away, she opened the car door so that Lane could put Gregory into his car seat. A man came up to Lark and said, " 'The purse, lady.' " Lark told him, " 'Please, sir, there is nothing in it.' " The man demanded Lark's purse again, and she was in midsentence when he shot her multiple times. After shooting Lark, the man ran, without taking Lark's purse or Lane's wallet, I-pod, and Coach wallet, all of which were in plain view. Lark died as a result of multiple gunshot wounds, five in total.

Lane did not see where the man came from. According to her, the shooter wore all black, including black gloves, a hooded sweatshirt with the hood pulled down to his forehead, and a bandanna over the lower half of his face, leaving just his eyes and the bridge of his nose uncovered. He was about six feet tall and slender. Lane identified defendant as the shooter at trial, saying she recognized his eyes.[3]

The morning Lark was murdered, Mario Villalobos was in his bottom floor apartment at 2233 Marvin Avenue, the apartment complex adjacent to the one in which Lark lived.[4] After hearing gunshots at about 9:00 a.m., he looked out his doorway and saw a man wearing a "black kind of sweater" with his hands "tucked in." The man ran to the front of the yard and hopped over the fence and headed toward Washington

---

[3] Defendant is 6 feet or 6 feet 1 inch tall.

[4] After the trial court found that Villalobos was unavailable to testify, his prior testimony from October 2009 and from August 2010 was read to the jury.

5

Boulevard. The man was about 5 feet 8 inches or a bit taller and had a slim build.[5] Villalobos couldn't see the man's face because he wore a hood down to his forehead, but the man had a "[l]ight complexion like a Black but lighter toned skin."

At about 9:30 to 9:45 a.m., Jaque Smith was at Carmona and Washington, near Lark's apartment building, when she saw a Chevy Impala with paper plates from Finance Auto parked on the wrong side of the street. In the driver's seat sat a petite, skinny girl with her hair in individual braids. The girl, whom Smith identified as Dashiell, defendant's girlfriend, wore a scarf. After dropping her kids off at a nearby school, Smith returned to her car, which was parked on Washington. She saw a "ninja" dressed in black with only his or her eyes visible run around the corner, passing within an arms length of Smith. The person wore gloves and was not holding anything. Smith saw Dashiell drive towards Washington Boulevard. It "look[ed] like" the "ninja" may have gotten into the car, but Smith did not actually see the person get into it. The "ninja" was about 5 feet 8 inches and "skinny" but "not too skinny." Although at trial she could not recall that this person was Black, she told Detective Mark Holguin on the day Lark was killed that the person she saw was Black.

Jamie Melgar was also in his car on Marvin Avenue at about 9:30 a.m. when he heard gunshots. He saw a person wearing all black come from the building where the shots had been fired and go to the next building and jump a fence. The person was about six feet tall and skinny.

Surveillance cameras from a bakery close to Lark's apartment building captured footage of a person wearing dark clothing running on Marvin at 9:50 a.m. Police received the first 911 call regarding the shooting at 9:55 a.m.

Micquelyn Jones, a counselor at defendant's high school, texted or called defendant that morning because he had said he could help her move some things. At 9:57 a.m., he called her back. At 10:22 a.m., Dashiell was at a McDonalds and surveillance footage showed her going to defendant's car, a Chevy Impala. Jones picked

---

[5]     In August 2010, Villalobos said that the man was 5 feet 9 inches or 6 feet tall.

6

defendant up at 96th and Normandie at about noon that day, and when she picked him up, he was with his car, a gray Chevy Impala.

Cell phone tracking evidence showed that defendant was in the vicinity when Lark was shot.[6] At 9:56 a.m., a phone call was made from defendant's phone. That call accessed a cell tower on Jefferson Boulevard that was 4.95 miles from Lark's apartment building.

Dashiell was detained the same day Lark was shot. A scarf was in defendant's car. Defendant was also arrested the same day. He was stopped while in a different car. A gray hooded sweatshirt and black jeans that defendant said belonged to him were also in the car. The black jeans were on the front passenger seat.

Defendant was taken to a police station and placed in a room next to a room in which Dashiell had been placed. Speaking to each other through the wall, defendant asked what he was "here for?" Dashiell replied that "they trying to say" defendant "set it up," but she didn't know what they were talking about. During his interrogation, defendant said he went to the Valley around 9:00 a.m., 9:30 a.m. or 10:00 a.m. with Jones.

The next day, January 5, 2007, black pants and a black-gray sweatshirt were found in defendant's bedroom.

## II.  Procedural background.

On July 9, 2007, an information was filed alleging these counts against defendant:[7] counts 1 and 2, the second degree robberies of Dias and Henry (Pen. Code, § 211)[8] with gun enhancements (§ 12022.53, subd. (b)); count 3, the special circumstance murder of Lark (§§ 187, subd. (a), 190.2, subd. (a)(15) [murder while lying in wait] & (17) [murder

---

[6]    A cell tower transmits and receives radio signals from cell phones. A cell tower can be accessed within a radius of two miles.

[7]    Dashiell was also charged in the complaint, but she was tried separately and is not a party to this appeal.

[8]    All further undesignated statutory references are to the Penal Code.

while in the commission of attempted robbery]) with gun enhancements (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (c), (d)); count 4, the second degree attempted robbery of Lark (§§ 211, 664) with gun enhancements (§§ 12022, subd. (a)(1), 12022.53, subds. (b) & (c)); and count 6, attempting to dissuade a witness, Henry (§ 136.1, subd. (a)(2)).

Defendant was tried three times based on these charges. On November 17, 2009, the first jury found defendant guilty of count 6, attempting to dissuade or intimidate a witness (§ 136.1, subd. (a)(2)). The jury deadlocked on counts 1 to 4, and the trial court declared a mistrial as to those counts.

On September 8, 2010, a second jury deadlocked on counts 1 to 4, and the trial court declared a mistrial.

At the third trial, the jury, on July 18, 2011, found defendant guilty of: counts 1 and 2, robbery, and found true gun allegations; count 3, first degree murder and found true the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) and gun allegations (§ 12022.53, subds. (b), (c), (d));[9] and of count 4, attempted second degree robbery (§ 211) and found true gun allegations (§ 12022.53, subds. (b), (c), (d)).

On November 8, 2011, defendant was sentenced as follows: on count 1, five years plus a consecutive ten years under section 12022.53, subdivision (b); on count 2, a consecutive one year term plus three years four months under section 12022.53, subdivision (b); on count 6, two years; and on count 3, life without the possibility of parole plus 25 years to life under section 12022.53, subdivision (d). The court sentenced defendant to three years on count 4, but stayed the sentence under section 654. The court also stayed the sentences on the remaining gun enhancements. Defendant's total sentence therefore was life without the possibility of parole plus 21 years 4 months plus 25 years to life.

---

[9]     The jury deadlocked on the special circumstance allegation that the murder was committed during the commission of an attempted robbery.

**DISCUSSION**

**I.     Challenges to the sufficiency of evidence.**

Defendant challenges the sufficiency of the evidence to support (1) the robberies of Henry and Dias, (2) the murder of Lark, and (3) the concealment and watchful waiting elements of the lying-in-wait special circumstance. We find that sufficient evidence supports the robbery and murder convictions and the special circumstance finding.

**A.     *Standard of review.***

To determine whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307.) Unless the testimony is physically impossible or inherently improbable, a single witness's testimony is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

9

B. *Sufficient evidence supports the robbery convictions.*

In addition to murdering Lark, defendant was found guilty of robbing her daughter, Henry, and Henry's boyfriend, Dias. Defendant, however, claims that there is insufficient evidence to support his convictions for robbing Henry and Dias because the eyewitness identifications were faulty.

Although the testimony of a single witness would have been sufficient to support defendant's conviction, *four* witnesses identified defendant as the robber. White, who went to high school with defendant, said, " 'That was Tyquan,' " immediately after he robbed Henry and Dias. Henry, Dias, and Mize identified defendant from photographic six-packs. In addition to these eyewitness identifications, defendant, about one month after the robbery, pawned a Rolex chain similar to the one stolen from Dias. Defendant and his mother made calls to Henry and Lark that they found threatening. Dashiell, defendant's girlfriend, went to Henry's workplace and intimidated her.

Defendant's attacks on the eyewitness identifications are based on matters uniquely within the province of the jury. He argues, for example, that Henry's and Dias's descriptions of what the robber wore differed from Betton's (defendant's friend who was with him that night). He also argues that Henry, Dias, and Mize merely adopted White's identification of defendant as the robber. These arguments ignore that Henry, Dias, and Mize independently selected defendant from photographic six-packs as the man who robbed them at gunpoint. It also ignores that it was the jury's duty to evaluate the strength and weaknesses of the identifications.

Defendant again intrudes on the province of the jury when he suggests that the identifications were inaccurate because the robbery occurred at night, under poor lighting conditions, over a short period of time, among a large group of people, and with the distracting, stressful presence of a gun. But the jury was instructed on how to evaluate a witness's testimony. (CALJIC Nos. 2.11, 2.13, 2.20, 2.23, 2.21.1, 2.21.2, 2.22, 2.27 & 2.92.) The jury was, for example, instructed that in considering an eyewitness's believability, it should consider the witness's "opportunity" or "ability" to observe the alleged criminal act and the stress to which the witness was subjected at the time of the

10

observation. (CALJIC Nos. 2.20, 2.92.) We presume the jury followed these instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.) We may not substitute our evaluation of the evidence for the jury's. (*People v. Zamudio, supra,* 43 Cal.4th at p. 357.)

C.    *Sufficient evidence supports the murder convictions.*

Next, defendant contends that the jury's conclusion he killed Lark was merely "divined" by the witnesses rather than based on substantial evidence.

To the contrary, Lark's daughter, Henry, identified defendant as the person who robbed her and Dias. Although Henry did not want to testify, Lark insisted that Henry do so. Defendant and people close to him (his mother, girlfriend, and friend) contacted Henry. Although their intent in contacting Henry may be open to interpretation, Henry was clear how being contacted made her feel: threatened. The other robbery victim, Dias, was more clearly told to " 'watch [his] back.' "

Even if we ignore evidence connected to the robbery that establishes a motive for defendant to kill Lark and focus just on evidence from the day Lark was murdered, it is clear that the judgment is based on sufficient evidence and not divination or supposition that because defendant robbed Henry he must have killed her mother. The description of the killer, for example, fit defendant. Although he was dressed all in black and his face was covered, Lane and Melgar said the man they saw was slender and six feet tall, about defendant's height. Lane also identified defendant as the shooter, saying she recognized his eyes. Villalobos, the neighbor who saw a man running from the crime scene, said the man had a "light complexion like a Black but lighter toned skin." At the same time of the shooting, defendant's girlfriend, Dashiell, was parked in defendant's car near Lark's apartment building. Smith, who was dropping her daughter off at school, saw a man matching the description of the shooter possibly get into the car.

Surveillance footage from a bakery near Lark's apartment building captured footage of a man wearing dark clothing running at 9:50 a.m., after Lark was shot. At 9:57 a.m., defendant returned the calls of Micquelyn Jones, his school counselor. A

11

reasonable inference from this timing is that defendant had time to kill Lark, run to Dashiell who was waiting for him in a car, and then call Jones.

D. *Sufficient evidence supports the special circumstance finding.*[10]

Murder committed by means of lying in wait is first degree murder. (§ 189.) The lying-in-wait special circumstance requires " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." ' " (*People v. Moon, supra,* 37 Cal.4th at p. 22; see also CALJIC No. 8.81.15.1.)[11] The concealment element is satisfied by a showing that the defendant's actions or conduct concealed his true intent and purpose. (*Moon*, at p. 22; see also *People v. Stevens, supra,* 41 Cal.4th at p. 202 ["The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' [Citation]."]) The concealment element may be satisfied where there is evidence of physical concealment from the victim, for example, an ambush, or by the creation of a situation where the victim is taken unawares by the murderer, for example, a ruse is used. (*People v. Morales* (1989) 48 Cal.3d 527, 554-555 [defendant and accomplice invited victim to the mall and during the drive, defendant reached from the back seat and strangled the victim, who sat in the front passenger seat], disapproved on another ground in *People v.*

---

[10]    A sufficiency of the evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction. (*People v. Stevens* (2007) 41 Cal.4th 182, 201; *People v. Moon* (2005) 37 Cal.4th 1, 22.)

[11]    The jury was instructed: "Murder which is immediately preceded by lying in wait is [a] murder in the first degree. [¶] The term [']lying in wait['] is defined as a waiting and watching for an opportune time to act[,] together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration be substantial, that is, an amount of time that shows the killer had a state of mind equivalent to premeditation or deliberation. The words [']premeditation['] and [']deliberation['] are defined elsewhere in these instructions."

*Williams* (2010) 49 Cal.4th 405, 459; *People v. Gurule* (2002) 28 Cal.4th 557 [while accomplice engaged the victim in conversation, defendant surprised the victim from behind].)

"As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " [Citation.]' [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.) Even a "few scant minutes" can suffice. (*People v. Moon, supra,* 37 Cal.4th at p. 23.) Whether a murder was committed by lying in wait is determined on a case-by-case basis, scrutinizing all the surrounding circumstances. (*People v. Morales, supra,* 48 Cal.3d at pp. 557-558; *Mendoza*, at p. 1075.)

The circumstances surrounding Lark's murder support the special circumstance finding. After defendant robbed Henry and Dias, robbery charges were filed against him on October 12, 2006. Around that time, threats and intimidation aimed at Henry, Lark, and Dias began. These threats frightened Henry and Lark so much that they considered moving. The prior robbery and attempts to get Henry not to testify against defendant thus provided a motive for lying in wait to kill Lark, who had insisted that her daughter testify. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1143 [the defendant's prior history with the victim provided a motive for lying in wait].)

On the day Lark was murdered, Henry left early in the morning, about 7:00 a.m. She did not see anybody outside her apartment when she left. Nor did Lane see anyone when she and Lark were in the parking lot around 9:30 a.m. That parking lot was surrounded by a fence and was accessible by a driveway. Lane did not see where defendant came from, raising a reasonable inference he concealed himself somewhere in the lot, waiting for Lark so that he could launch a surprise attack. (See, e.g., *People v. Harrison* (1963) 59 Cal.2d 622, 630 [witness who was with the victim did not see defendant until he stepped in front of them, thus "the jury could reasonably have inferred that the killer was in hiding, as no one saw him before the murder"]; *People v.*

13

*Edelbacher* (1989) 47 Cal.3d 983, 1020 [that the defendant was not seen on the street before or after shooting his estranged wife showed that the "killing was preceded by a period of watchful waiting"].)[12] That defendant was dressed all in black and obscured his face buttressed that inference.

The presence of defendant's girlfriend nearby further supported a finding that he watched and waited for Lark. A witness, Smith, saw Dashiell sitting in the driver's seat of defendant's car. The car was parked the wrong way on Washington, near Lark's apartment building. After Smith walked her children into their school, Smith returned to her car and again saw Dashiell, but this time she saw a person run towards Dashiell and possibly get into the car. The inference from this evidence was Dashiell and defendant drove to Lark's apartment or to a place nearby. Dashiell waited in the car for defendant to murder Lark, and she drove defendant from the scene of the crime. Defendant acted insidiously rather than from a rash impulse. (*People v. Moon, supra,* 37 Cal.4th at p. 22.)

Defendant takes a contrary view of the evidence, essentially rearguing the evidence and making inferences favorable to him. He, for example, argues that the shooter arrived at Lark's apartment building around 9:47 a.m., just minutes before shooting Lark; hence, there was no "substantial" period of watching and waiting. To support this assertion, he cites Smith's testimony she saw Dashiell in defendant's car at 9:45 a.m. and surveillance footage showing someone running from Lark's apartment building at 9:50 a.m.[13] Smith, however, was not so precise. She testified she first saw Dashiell at 9:30 a.m. or 9:40 a.m. or 9:45 a.m.—she was uncertain. Even if we assume that Dashiell arrived at 9:45 when Smith saw her, that does not tell us what time she

---

[12] Defendant distinguishes *Harrison* and *Edelbacher* because there was evidence in those cases that the defendants hid in the dark of night, were familiar with the locations, there were hiding places, and the defendants knew their victims' schedules. Because whether a murder was committed by lying in wait must be judged on a case-by-case basis, we do not find these claimed differences material.

[13] Twenty four-hour surveillance cameras from the nearby bakery did not depict defendant on Marvin at any time from 12:01 a.m. to 9:50 a.m., when the cameras captured him running from Lark's building after shooting her.

dropped defendant off at or near Lark's apartment, because whenever Smith first saw Dashiell, Dashiell was alone. Defendant therefore had already, perhaps minutes or hours before, gone to Lark's apartment building. In any event, this parsing of time does not further defendant's argument, because even a "few scant minutes" can satisfy the watching and waiting element. (*People v. Moon, supra,* 37 Cal.4th at p. 23.) Given that Lane never saw defendant in the parking lot before his surprise attack and could not say where he came from, this was sufficient evidence he concealed himself from view and watched and waited for Lark.

Next, defendant argues that there was no evidence he knew Lark's schedule or where she lived. Defendant ignores reasonable inferences to the contrary. Defendant had acquaintances or friends in common with Henry, Lark's daughter. In fact, the night defendant robbed Henry, she was with Ebonie White, who knew defendant and whose boyfriend played football with defendant. Henry also knew Ryan Betton, who was there the night of the robbery and who was friends with defendant. Thus, although defendant was not friends with Henry, he managed to get her cell phone number. Moreover, Dashiell, defendant's girlfriend, visited Henry at her workplace. The evidence therefore established that defendant was able to access and to use private information about Henry and her family. Even if defendant did not know Lark's schedule, a jury could reasonably have found that this supported the special circumstance: ignorant of when Lark would leave her apartment, he hid nearby, watching and waiting for her.

Defendant also argues that there was no place for him to conceal himself and to watch and wait for Lark in the largely inaccessible and open parking lot. Surely, he argues, people would have seen him before the murder, while they were getting their cars from the parking lot to go to work. There was, however, extensive evidence about the layout of the apartment building and surrounding area where Lark was killed, including photographs. (See, e.g., People's Exhs. 8-12, 50, 54-56, 57-59, 72.) From that evidence, as well as from the crucial fact that Lane did not see anybody before defendant appeared and shot Lark, the jury could reasonably conclude that defendant did hide somewhere in or near the parking lot.

15

Defendant's suppositions to the contrary amount to nothing more than an improper attempt to reweigh the evidence. The standard of review, however, requires us to view the evidence in the light most favorable to the prosecution. It is not our duty—or appellate counsel's—to reweigh that evidence and to draw inferences favorable to defendant. (*People v. Smith* (2005) 37 Cal.4th 733, 739; *People v. Ceja, supra,* 4 Cal.4th at p. 1142.)

**II.      Evidence regarding the Rolex chain was properly admitted.**

Evidence was admitted that a Rolex chain was stolen from Dias and that defendant, about a month after Dias was robbed, pawned a Rolex chain. Although the police placed a hold on the chain, it was lifted and the pawnshop owner probably melted the chain down. The chain itself therefore was not introduced into evidence, and Dias never identified the chain at the pawnshop as the chain that was stolen from him. Defendant now contends that evidence defendant pawned a gold chain should not have been admitted because it was prejudicial, irrelevant, and lacked foundation and, in any event, his trial counsel provided ineffective assistance of counsel by failing to object to the evidence on due process and "basic fairness" grounds.

Only relevant evidence is admissible. (Evid. Code, § 350.)[14] Evidence is relevant if it has a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action, including identity, intent or motive. (Evid. Code, § 210; *People v. Mills* (2010) 48 Cal.4th 158, 193; *People v. Lee* (2011) 51 Cal.4th 620, 642.) Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the probability its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission, but a court lacks discretion to admit irrelevant evidence. (*People*

---

[14]      Defendant's trial counsel did not object on relevance grounds but did object under Evidence Code section 352.

*v. Cowan* (2010) 50 Cal.4th 401, 482; *Mills*, at p. 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)

The evidence was relevant. Dias identified defendant as the person who stole his Rolex chain. One month later, defendant pawned a Rolex chain. The evidence was sufficient to give rise to a reasonable inference that defendant stole Dias's Rolex chain; hence, the evidence was relevant to establishing defendant's identity as the robber. It was also relevant to the murder count; specifically, to defendant's motive to kill Lark. He wanted to dissuade witnesses from identifying him as the robber.

Not only was the evidence relevant, it was also, in the trial court's discretion, admissible under Evidence Code section 352. The " ' "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual . . . .' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) But " ' " 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.) As we have said, the evidence was highly probative on the issues of identity and motive. Defendant denied involvement in the crimes: he denied stealing Dias's chain and murdering Lark. That he pawned a chain one month after Dias's chain was stolen tended to show that he was involved in the robbery, and it provided a motive for him to kill Lark. We see no abuse of discretion in admitting the evidence.

The ineffective assistance of counsel issue is easily addressed, because defendant's trial counsel *did* object to the evidence. (See generally, *Strickland v. Washington* (1984) 466 U.S. 668.) At defendant's second trial, defense counsel objected to the pawnshop owner's testimony because of "a discovery violation," "they can't connect the chain to the one being stolen" from Dias as a result of the violation, and under Evidence Code section 352. The trial court found that there was no discovery violation. The court also said: "[T]he defense raises a so-called [*California v.*] *Trombetta* [(1984) 467 U.S. 479] slash [*Arizona v.*] *Youngblood* [(1988) 488 U.S. 51] motion as a prerequisite to a prima facie showing that defense must indicate the exculpatory evidence of the nature was apparent at the time of any destruction or a version of the destruction of evidence. It is certainly not the case here, [it] is quite the

17

contrary. [¶] So the pre-condition under a test in California, in the United States Supreme Court, present is the exculpatory value be apparent, and that is not established." Finally, the court refused to exclude the evidence under Evidence Code section 352, finding that its probative value did not outweigh any prejudicial impact.

At the third trial, defense counsel renewed the objections before the pawnshop owner, Jacobson, testified: "Your Honor, with respect to Mr. Jacobson, the defense had at the last proceeding raised an objection to his testimony. And it was a well-argued motion at [the] time, and I'd ask the court to incorporate that argument and motion into this proceeding. [¶] If the court recalls, it was because the chain had been destroyed. The defense has not had an opportunity to present Mr. Dias with that chain to have him identify it or not identify it." "We renew that motion and ask that the court incorporate by reference our arguments from the prior proceeding into this proceeding." The court then incorporated its ruling that there was no "constitutional or statutory impediment, that there is no bad faith whatsoever."

Defendant does not address this incorporation of the prior objections into the third trial. Based on the objections, we conclude that trial counsel was not ineffective.

## III.    The testimony of the unavailable witness, Villalobos.

After a hearing, the trial court found that Mario Villalobos was unavailable and allowed his prior testimony to be read to the jury. Defendant contends that his federal constitutional rights to confront witnesses against him and to "fairness" and due process were violated. (U.S. Const., 5th, 6th & 14th Amends.) We disagree.

A.    *Additional facts regarding the due diligence hearing.*

Villalobos lived in the apartment building next to Lark's. The morning she was murdered, he saw a man dressed in black running toward Washington Boulevard. Although he did not see the man's face, Villalobos described him as 5 feet 8 inches or taller with a slim build and light complexion. Villalobos testified at the first trial in 2009 and at the second trial in 2010. At the third trial in 2011, the People were unable to serve him and therefore the trial court held a due diligence hearing.

18

At the due diligence hearing, Detective Holguin testified that Villalobos had been cooperative in offering testimony at the first and second trials, and he had no reason to believe that Villalobos would make himself unavailable to testify at the third trial. But, on the morning of June 24, 2011, Detective Holguin called Villalobos's cell phone. It was disconnected. A check of law enforcement databases showed that Villalobos was not in custody, did not have outstanding warrants, and did not have any vehicles registered to him. Holguin completed a Department of Motor Vehicles California identification check which showed no updated addresses, and he flagged Villalobos's California identification number so that he would be contacted if Villalobos was arrested. Remembering that Villalobos said he worked at a beauty store, Holguin drove to its location but could not find it. The detective tried Villalobos's cell phone again at 2:00 p.m., but it was still disconnected.

On June 28, 2011, Holguin repeated his computer runs, but found nothing new. He called Villalobos's cell phone, but it was still not working. Holguin's supervisor, Detective Carrillo, called Villalobos's father, who said his son would be out of the state for a month but could receive text messages on his phone. Holguin therefore sent a text to the phone but he never received a response. Holguin did computer runs on July 5, 6, 7 and 8 but still found no new information.

Debora Bailey, an investigator for the Los Angeles County District Attorney's Office, tried to serve a subpoena on Villalobos on June 27, 2011. Before doing so, Bailey checked various law enforcement databases and confirmed that he was not in custody or dead. His driver's license, however, was expired. Villalobos's former employer had no information. She went to an apartment on Comey that he lived at in December 2010, but he was not there. She also checked the apartment on Marvin where he'd been living with his family. Although a girl playing outside said that Villalobos lived there, his younger brother, who answered the door, said he was not at home. The brother said that Villalobos did not have a phone number, but he took Bailey's card. Bailey and Michael Harris, another investigator, returned to the apartment on Marvin on June 28, 2011 and spoke to Villalobos's father, Mariano, who said his son was in San Francisco. Mariano

19

was uncooperative, refusing to answer questions about whether Villalobos worked or had a cell phone.

Bailey then contacted the employee development department and discovered that Villalobos had worked at Rainbow Beauty Supply Company in Los Angeles. The CEO told her that Villalobos was laid off on May 13, and he had no other information.

On June 29, 2011, Harris called Villalobos's cell phone number, which was no longer in service, and his brother's cell phone, which rang but never picked up. Harris tried a home number for Villalobos, and his younger sister, Stephanie, answered. When he asked if Villalobos was home, she said she would check, but then she said he was not there and she didn't know when he would return.

On July 1, 2011, a Spanish speaking investigator, Guerra, called the home number and asked for Villalobos. Stephanie told Guerra that Villalobos would be home in one hour. Harris therefore drove to the apartment at about 10:15 a.m., and waited for Villalobos until about 10:30, but he did not show up. Guerra called the house again and was told that Villalobos had not returned but he might be back later.

On July 5, 2011, Investigator Karen Pewitt went to the apartment on Marvin. Mariano said his son was not at home, and when a teenage boy tried to explain why Villalobos was not there, Mariano shut the door.

Harris returned to the apartment on July 7, 2011 with the subpoena. Mariano answered the door, but when Harris said he had a subpoena he shut the door. Harris slid the subpoena under the door. Harris showed Villalobos's picture to a neighbor and asked if he'd seen Villalobos, but the neighbor had just moved in. That evening, Harris and Pewitt went to another address in Playa del Rey associated with Villalobos. The woman who answered the door said Villalobos did not live there, but he was her boyfriend's friend. Harris and Pewitt returned to the apartment on Marvin in the evening and was told again that Villalobos was not home. Villalobos's mother said she didn't know where her son was.

Pewitt returned to the apartment on Marvin on July 10, 2011 at approximately 1:45 p.m. That same day she called his brother, Gio, at 4:45 and 11:41 p.m. During the

first call, Gio said Villalobos was not around. But during the second call, Gio denied giving his name. Pewitt also spoke to Mariano, who said he didn't know who Villalobos was.

Detective Holguin went to the apartment on Marvin on July 11, 2011, at 6:00 p.m., but nobody answered the door. The morning of July 12, Holguin sat outside the apartment building at 5:00 a.m., but he didn't see any cars registered to Villalobos and nobody answered the door at 6:00 a.m. He ran computer checks again.

Based on this evidence, the trial court found, first, that the search was begun timely. "This case has a complicated history and the case also was set for trial to begin over this summer, in the late summer, and we had been proceeding on that basis. Because of significant scheduling changes with another one of my trials, I implored counsel to see if counsel could begin the case earlier. [¶] [The prosecutor] always had said that she wanted to make sure she was ready. She would do everything she could to get ready, and I believe she and the members of her office and LAPD, through Detective Holguin, expended extraordinary efforts in advancing this case and in undertaking efforts of a substantial character to detain witnesses. [¶] . . . It is important to remember something. That is, in this case Mario Villalobos was a cooperative, in fact overly cooperative, witness. . . . There was no basis to suspect or conclude that Mr. Villalobos would go south on this case because of that cooperative attitude. So there was no reason to anticipate the situation now confronting Detective Holguin and the People. [¶] . . . [¶] The next important factor is importance of testimony. Mr. Villalobos's testimony is very important in this case. It is not critical or crucial, but it is very important and that is a factor . . . . [¶] . . . [¶] Were leads competently explored, dramatically so. There was a significant expenditure of resources to sit on the house, to continue to call various phone numbers to try to locate other possible places where Mr. Villalobos could be hiding, where he could be working, where he could be staying, et cetera. All leads very dramatically, competently explored. [¶] There was no promising information. The realistic and reasonable conclusion in this case is that Mr. Villalobos knew full well and knows full well that he is wanted as a witness in this case. He is intentionally avoiding

21

service.  His family members are intentionally assisting in this effort.  The prosecution went to extraordinary extents to actually subpoena Mr. Villalobos senior, and Mr. Villalobos, Senior isn't responding.  [¶]  So you have a concerted effort on the part of the family and/or friends to hide Mr. Villalobos and there is no proper information out there."

        B.     *The prosecution exercised due diligence in its efforts to locate Villalobos.*

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses.  [Citations.]  That right is not absolute, however.  An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination.  Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial.  [Citations.]"  (*People v. Cromer* (2001) 24 Cal.4th 889, 892; see also *People v. Bunyard* (2009) 45 Cal.4th 836, 849; *People v. Valencia* (2008) 43 Cal.4th 268, 291-292; *People v. Smith* (2003) 30 Cal.4th 581, 609.)  Under state law, a witness's prior recorded testimony may be introduced if the prosecutor used " 'reasonable diligence,' " also referred to as "due diligence," "in its unsuccessful efforts to locate the missing witness."  (*Cromer*, at p. 892; Evid. Code, § 240, subd. (a)(5); see also Evid. Code, § 1291, subd. (a)(2).)

Although the term " 'due diligence' " is " 'incapable of a mechanical definition' " (*People v. Cromer, supra,* 27 Cal.4th at p. 904), it " ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character" ' " (*People v. Valencia, supra*, 43 Cal.4th at p. 292).  Whether due diligence is shown depends upon the totality of efforts used to locate the witness, including the character of the prosecution's efforts; whether the search was timely begun; the importance of the witness's testimony; whether leads were competently explored; whether the proponent of the evidence reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena the witness when he or she was available; and whether the witness would have

been produced if reasonable diligence had been exercised. (*Ibid*.; *Cromer,* at p. 904; *People v. Wilson* (2005) 36 Cal.4th 309, 341.)

Whether a party exercised reasonable diligence to locate a missing witness is a mixed question of law and fact. (*People v. Cromer, supra*, 24 Cal.4th at pp. 894, 901.) We defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness, but independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability. (*Id.* at pp. 900-901.)

The prosecution exercised due diligence to locate Villalobos. Villalobos's testimony, while important, was, in the trial court's words, not critical or crucial. Villalobos could not identify the shooter, but he did give a general height and build description that matched defendant's. These facts, however, were established by other witnesses. Smith said the man she saw was about 5 feet 8 inches and "skinny." Melgar similarly described the man he saw running as being about six feet tall and skinny.

The record supports the trial court's finding that the prosecution had no reason to believe that Villalobos would make himself unavailable. (See, e.g., *People v. Lopez* (1998) 64 Cal.App.4th 1122, 1128 [prosecution had no reason to believe witness who had testified at the preliminary hearing would not cooperate with efforts to obtain her testimony at trial].) He had willingly testified at defendant's first and second trials and had even been "overly cooperative." Having no reason to suspect that Villalobos would avoid testifying when he had testified at the two prior trials, Detective Holguin tried to contact Villalobos on June 24, less than a week before the jury was sworn in on June 28, 2011. Given that Villalobos had been a cooperative witness, the search for him was timely begun. (See, e.g., *People v. Smith* (1971) 22 Cal.App.3d 25, 32 [where witness had appeared at prior proceedings, an unsuccessful attempt to subpoena him four days after date for trial was set was timely].)

Once the search for Villalobos began, leads concerning his whereabouts were competently explored, and the prosecution's efforts to locate him were extensive. In addition to Detective Holguin, three district attorney investigators tried to find him. They made multiple phone calls to his cell phone and to the landline at the apartment on

23

Marvin. Detective Holguin staked out the apartment, both early in the morning and in the evening, times when one might expect a person to leave or arrive at home. An investigator tried to find Villalobos at his friend's house and at a prior place of employment. The investigators also contacted defendant's family, who were openly hostile and clearly aiding Villalobos's efforts to avoid service of the subpoena. (Contrast *People v. Cromer, supra,* 24 Cal.4th at p. 904 [investigator failed to speak to the witness's mother, the person most likely to know the witness's whereabouts].)

Because the People exercised due diligence in trying to secure Villalobos's presence at the third trial, the admission of his prior testimony did not violate defendant's confrontation right.

## IV. *Kelly-Frye.*[15]

Defendant next contends that his trial counsel provided ineffective assistance of counsel by failing to object to the cell phone tracking evidence under *Kelly-Frye.* We find that error has not been established.

Under *Kelly-Frye*, the admissibility of evidence produced by a new scientific technique requires a preliminary showing that: (1) the technique is generally accepted in the relevant scientific community; (2) the witness testifying on the technique is properly qualified as an expert; and (3) correct scientific procedures were followed in the particular case. (*Kelly, supra,* 17 Cal.3d at p. 30; see also *People v. Venegas* (1998) 18 Cal.4th 47, 76.) Although the definition of a " 'new scientific technique' " is unclear, courts will make the determination "by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel or ' "experimental," ' convey a ' "misleading aura of certainty." ' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155-1156.)

Defendant's trial counsel did not object to the evidence on this ground. This issue therefore has been forfeited on appeal. (See, e.g., *People v. Kaurish* (1990) 52 Cal.3d 648, 688; *People v. Ochoa* (1998) 19 Cal.4th 353, 414.)

---

**15** *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*) and *Frye v. United States* (1923) 293 F. 1013, 1014 (*Frye*).

In any event, we cannot find, on this record, that defendant's trial counsel provided ineffective assistance by failing to object under *Kelly-Frye. Kelly-Frye* issues are "generally steeped in scientific and technical complexity." (*People v. Kaurish, supra,* 52 Cal.3d at p. 688.) But the sole citation to cell phone tracking technology in the supplemental opening brief is to an article from the American Bar Association's Journal: Hansen, "*Prosecutors' Use of Mobile Phone Tracking Is 'Junk Science,' Critics Say*" (June 2013). That article is insufficient to establish that trial counsel either committed error by failing to object to cell phone tracking evidence under *Kelly-Frye* or that counsel lacked a tactical reason not to object. (See generally, *Strickland v. Washington, supra,* 466 U.S. 668 [a defendant claiming ineffective assistance of counsel must establish both error and prejudice]; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

## V. Cumulative error.

Defendant contends that the cumulative effect of the purported errors deprived him of a fair trial. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.